In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-3426

LEWIS D. DEL MARCELLE,

*Plaintiff-Appellant*,

*v.*

BROWN COUNTY CORP., *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 10-C-785—**William C. Griesbach**, *Judge*.

SUBMITTED MARCH 8, 2011—
ARGUED EN BANC SEPTEMBER 23, 2011—DECIDED MAY 17, 2012

Before EASTERBROOK, *Chief Judge*, and POSNER, FLAUM,
KANNE, ROVNER, WOOD, WILLIAMS, SYKES, TINDER, and
HAMILTON, *Circuit Judges*.

PER CURIAM. Five judges have voted to affirm the
district court's judgment and five to remand for further
proceedings. The result of this tie vote is affirmance,
because it takes a majority to reverse a judgment.

Although it is customary not to issue opinions when an appellate court affirms on a tie vote, there are occasional departures. See, e.g., *School District of the City of Pontiac v. Secretary of Education*, 584 F.3d 253 (6th Cir. 2009) (en banc); *United States v. McFarland*, 311 F.3d 376, 417-20 and n. 1 (5th Cir. 2002) (en banc) (dissenting opinion, collecting cases); *United States v. Walton*, 207 F.3d 694 (4th Cir. 2000) (en banc); *United States v. Klubock*, 832 F.2d 664 (1st Cir. 1987) (en banc); see also *Standard Industries, Inc. v. Tigrett Industries, Inc.*, 397 U.S. 586 (1970) (dissenting opinion); *Biggers v. Tennessee*, 390 U.S. 404, 404 n. 1 (1968) (dissenting opinion, collecting cases). A majority of the judges of the court have concluded that this is an appropriate occasion for such a departure. The law concerning "class of one" equal-protection claims is in flux, and other courts faced with these cases may find the discussion in the three opinions in this case helpful.

Judge Posner's lead opinion is joined by Judges Kanne, Sykes, and Tinder. Chief Judge Easterbrook has written an opinion concurring in the judgment. Judge Wood's dissenting opinion is joined by Judges Flaum, Rovner, Williams, and Hamilton.

The judgment is affirmed by an equally divided court.

POSNER, *Circuit Judge*, with whom KANNE, SYKES, and TINDER, *Circuit Judges*, join. The plaintiff brought this federal civil rights suit against law enforcement officers in a Wisconsin county (and against the county itself), charging that they had denied him equal protection of the laws. They had done this, the complaint alleges, by failing to respond to his complaints about gangs that were harassing him and his wife and had eventually forced them to sell their house in the Village of Denmark and move to another village in the county, with the gangs in hot pursuit. The district court, interpreting the pro se complaint as simply a complaint about inadequate police protection, dismissed the suit for failure to state a claim, correctly ruling that states are not required by the Fourteenth Amendment to provide adequate police protection against private violence. *DeShaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189, 197 (1989); *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000); *Schroder v. City of Fort Thomas*, 412 F.3d 724, 725-26 (6th Cir. 2005).

The plaintiff appealed, and the appeal was submitted to a three-judge panel in March 2011. The panel noted that the complaint could be interpreted as charging the defendants with arbitrarily providing less police protection to the plaintiff and his wife than the police provide to other residents of Brown County. See *Geinosky v. City of Chicago*, 675 F.3d 743 (7th Cir. 2012). The plaintiff's invocation of the equal protection clause of the Fourteenth Amendment supported that characterization, and so interpreted the suit presented a "class of

one" discrimination claim, as distinct from a claim of discrimination based on a plaintiff's membership in a particular group, such as a racial or religious minority. However, although detailed, the complaint did not allege that the defendants' failure to protect the plaintiff from harassment by gangs had been the result of their harboring some personal animosity toward the plaintiff or his wife, and the panel concluded that without such an allegation the plaintiff's equal protection claim failed.

In advance of publication, the panel circulated its proposed opinion affirming the dismissal of the suit to the full court under Circuit Rule 40(e), because the opinion proposed a new approach to the standard of liability in class-of-one discrimination cases. The full court decided on April 12 of last year to hear the case en banc, and so the panel opinion was not published and instead the appeal was reargued before the full court. The plaintiff had litigated pro se, but upon deciding to hear the case en banc the court requested Thomas L. Shriner, Jr., of the law firm of Foley & Lardner LLP, to represent the plaintiff. We thank Mr. Shriner, his colleague Kellen C. Kasper, and the firm for their excellent representation of the plaintiff.

In deciding to hear the case en banc, the court had hoped that the judges might be able to agree on an improved standard for this difficult class of cases. We have not been able to agree. The court has split three ways, but by a tie vote has affirmed the dismissal of the suit.

This opinion, expressing the views of four judges, proposes a simple standard: that the plaintiff be re-

quired to show that he was the victim of *discrimination intentionally visited on him by state actors who knew or should have known that they had no justification, based on their public duties, for singling him out for unfavorable treatment—who acted in other words for personal reasons, with discriminatory intent and effect.* The plaintiff's complaint, although detailed, does not allege that the defendants failed to protect him from harassment because they wanted to single him out for unfavorable treatment and had no justification, such as limited resources, for their failure to protect him. For this reason, the suit is rightly being dismissed.

We believe that class-of-one suits should not be permitted against police officers or police departments, complaining about failure to investigate a complaint or otherwise provide police protection to a particular individual, unless the police, acting from personal motives, with no justification based on their public duties, intend to disfavor the plaintiff. Such suits, unless exceptional in the way just indicated, are neither necessary to prevent serious injustices nor manageable; they are not compelled by the equal protection clause or the case law interpreting it; they fill no yawning gap in the legal protection of Americans. This case and cases like it are remote from the original target of the equal protection clause—law enforcers who systematically withdraw protection from a group against which they are prejudiced. The unwillingness of the law enforcement authorities in southern states to protect the newly freed blacks from white vigilante groups such as the Ku Klux Klan was an important motive for the enact-

ment of the equal protection clause. *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 70-71 (1872); *Hilton v. City of Wheeling*, *supra*, 209 F.3d at 1007; David P. Currie, *The Constitution in the Supreme Court: The First Hundred Years* 349 (1985).

The history of class-of-one litigation can be said to have begun with our decision in *Olech v. Village of Willowbrook*, 160 F.3d 386 (7th Cir. 1998), though there were earlier cases in our court and in other courts as well. See *id*. at 387. The reason for making *Olech* the starting point of our narrative is what the Supreme Court did with it.

The Olechs wanted the Village to connect their home to the municipal water system. The Village agreed, but only on condition that the Olechs grant it not the customary 15-foot-wide easement to enable the Village to service the water main but a 33-foot-wide easement to enable the Village to widen the road on which the Olechs lived. They rejected the condition, and after several months of disputation the Village relented, admitted that it had had no good reason to demand the wider easement, and agreed to hook up the Olechs' home to the water main in exchange for the standard 15-foot easement. The Olechs sued for the damages they'd sustained by being without water during the period in which the Village was demanding the larger easement. They claimed that the Village had had no justification for treating them differently from other property owners—it had done so to punish them for having successfully sued it for negligently installing culverts near their property.

The district court dismissed the Olechs' suit for failure to state a claim. We reversed. Though "troubled . . . by the prospect of turning every squabble over municipal services . . . into a federal constitutional case," we were comforted by the thought that "the 'vindictive action' class of equal protection cases requires proof that the cause of the differential treatment of which the plaintiff complains was a totally illegitimate animus toward the plaintiff by the defendant." *Id*. at 388.

The Supreme Court affirmed our decision in a brief per curiam opinion, *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000), but without making clear what role if any motive should play in such cases. It emphasized the allegations "that the Village's demand was 'irrational and wholly arbitrary' and that the Village ultimately connected [the Olechs'] property [to the water system] after receiving a clearly adequate 15-foot easement," and said that "these allegations, quite apart from the Village's subjective motivations, are sufficient to state a claim for relief under traditional equal protection analysis. We therefore affirm the judgment of the Court of Appeals, but do not reach the alternative theory of 'subjective ill will' relied on by that court." *Id*. at 565.

One hears frequent laments that modern Supreme Court opinions are too long, but the opinion in *Olech* is too short. It leaves the key words "irrational" and "wholly arbitrary" undefined in the class-of-one context. "[T]raditional equal protection analysis" is situation specific: industry groups complaining about discriminatory regulations do not receive the same consideration

in equal protection case law as blacks or women complaining about racial or sexual discrimination. Women for that matter don't receive as much consideration as blacks; and hippies, the elderly, and the mentally impaired don't receive as much consideration as women or blacks. See *Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 109-10 (1949); *United States Dep't of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973); *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 312-14 (1976) (per curiam); *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 440-43 (1985); *Clark v. Jeter*, 486 U.S. 456, 461 (1988); *Grutter v. Bollinger*, 539 U.S. 306, 326-27 (2003). Class-of-one discrimination might well be thought also to require a different level of consideration from other forms of discrimination challenged under the equal protection clause, as the Court was later to realize. Justice Breyer, concurring in the judgment but not in the majority opinion in *Olech*, said that the presence of subjective ill will was "sufficient to minimize any concern about transforming run-of-the-mill zoning cases into cases of constitutional right." 528 U.S. at 566. The majority ignored his concurrence.

We have difficulty understanding why—since the issue in *Olech* was simply whether class-of-one equal protection claims are permissible—the Court took the occasion to reject, or at least appear to reject, the limiting principle that we had suggested and Justice Breyer had endorsed. The Court need not have endorsed it—it need only have confined the *immediate* decision to cases in which ill will was shown; if later a case arose in which a compelling equal protection argument was made

despite the absence of a bad motive, the Court could have allowed the case to proceed without contradicting anything in its opinion in *Olech*. Making the presence of ill will a factor in the conclusion that the Olechs had stated a claim would have launched modern class-of-one equal protection litigation on calmer waters.

Like Justice Breyer, lower-court judges did not believe that class-of-one litigation could be kept from exploding without some limiting principles, but they (we) couldn't and still can't agree on what those principles should be. Eight years ago a concurring opinion in *Bell v. Duperrault*, 367 F.3d 703, 709-13 (7th Cir. 2004), noted the lack of clarity concerning the standard for deciding such cases, echoing scholarly commentary: Robert C. Farrell, "Classes, Persons, Equal Protection, and *Village of Willowbrook v. Olech*," 78 *Wash. L. Rev.* 367, 400-25 (2003); J. Michael McGuinness, "The Impact of *Village of Willowbrook v. Olech* on Disparate Treatment Claims," 17 *Touro L. Rev.* 595, 603-06 (2001); Shaun M. Gehan, Comment, "With Malice Toward One: Malice and the Substantive Law in 'Class of One' Equal Protection Claims in the Wake of *Village of Willowbrook v. Olech*," 54 *Me. L. Rev.* 329, 379-80 (2002). And since then scholarly complaint about the lack of clarity in class-of-one case law has mushroomed. See H. Jefferson Powell, "Reasoning About the Irrational: The Roberts Court and the Future of Constitutional Law," 86 *Wash. L. Rev.* 217, 261-76 (2011); Benjamin L. Schuster, "Fighting Disparate Treatment: Using the 'Class of One' Equal Protection Doctrine in Eminent Domain Settlement Negotiations," 45 *Real Property, Trust & Estate L.J.* 369, 391-

94 (2010); Robert C. Farrell, "The Equal Protection Class of One Claim: *Olech*, *Engquist*, and the Supreme Court's Misadventure," 61 *S.C. L. Rev.* 107, 121-25 (2009); Kerstin Miller, Note, "*Engquist v. Oregon Department of Agriculture:* No Harm Meant? The Vanquished Requirement of Ill-Will in Class-Of-One Equal Protection Claims and the Erosion of Public Employees' Constitutional Rights*,"* 68 *Md. L. Rev* 915, 935-36 (2009); Matthew M. Morrison, Comment, "Class Dismissed: Equal Protection, the 'Class-of-One,' and Employment Discrimination After *Engquist v. Oregon Department of Agriculture*," 80 *U. Colo. L. Rev.* 839, 854-56 (2009); William D. Araiza, "Irrationality and Animus in Class-of-One Equal Protection Cases," 34 *Ecology L.Q.* 493, 498-500 (2007); Robert J. Krotoszynski, Jr., "Taming the Tail that Wags the Dog: Ex Post and Ex Ante Constraints on Informal Adjudication," 56 *Admin. L. Rev.* 1057, 1068 n. 50 (2004).

In *Hilton v. City of Wheeling*, *supra*, we took a stab at formulating a standard that we hoped would be both consistent with *Olech* and operable: "to make out a prima facie case the plaintiff must present evidence that the defendant deliberately sought to deprive him of the equal protection of the laws for reasons of a personal nature unrelated to the duties of the defendant's position." 209 F.3d at 1008. Hostility to the plaintiff ("animus"), the motive emphasized in our *Olech* opinion and in Justice Breyer's concurrence in the Supreme Court, was only one of the "reasons of a personal nature unrelated to the duties of the defendant's position" that we thought should be actionable in class-of-one litigation. Others included larceny, as in *Forseth v. Village of*

*Sussex*, 199 F.3d 363, 371 (7th Cir. 2000), and a desire to find a scapegoat in order to avoid adverse publicity and the threat of a lawsuit, as in *Ciechon v. City of Chicago*, 686 F.2d 511, 524 (7th Cir. 1982). These were wrongful acts, though not motivated by personal hostility to the victims, as in *Olech*.

We have applied the approach of *Hilton* in a number of cases: *Crowley v. McKinney*, 400 F.3d 965, 972 (7th Cir. 2005); *Fenje v. Feld*, 398 F.3d 620, 628 (7th Cir. 2005); *Tuffendsam v. Dearborn County Bd. of Health*, 385 F.3d 1124, 1127 (7th Cir. 2004); *Indiana Land Co., LLC v. City of Greenwood*, 378 F.3d 705, 712-13 (7th Cir. 2004); *Discovery House, Inc. v. Consolidated City of Indianapolis*, 319 F.3d 277, 283 (7th Cir. 2003); *Purze v. Village of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002); *Cruz v. Town of Cicero*, 275 F.3d 579, 587 (7th Cir. 2001). The approach we suggest in this opinion is a variant of it.

The picture in other circuits (in ours too, alas, continuing to this day) is very mixed, though there is considerable support for *Hilton*'s approach. See *SBT Holdings, LLC v. Town of Westminster*, 547 F.3d 28, 34 (1st Cir. 2008); *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 592 (9th Cir. 2008) ("the defendants simply harbor animus against her *in particular* and therefore treated her arbitrarily" (emphasis in original)); *Lindquist v. City of Pasadena*, 525 F.3d 383, 387 n. 2 (5th Cir. 2008); *Mimics, Inc. v. Village of Angel Fire*, 394 F.3d 836, 849 (10th Cir. 2005); *Jennings v. City of Stillwater*, 383 F.3d 1199, 1211-12 (10th Cir. 2004); *Williams v. Pryor*, 240 F.3d 944, 951 (11th Cir. 2001); *Shipp v. McMahon*, 234 F.3d 907, 916-17 (5th Cir. 2000), overruled

on other grounds by *McClendon v. City of Columbia*, 305 F.3d 314, 329 (5th Cir. 2002) (en banc) (per curiam); *Bryan v. City of Madison*, 213 F.3d 267, 276-77 and n. 17 (5th Cir. 2000). Some of our own cases, however, while accepting *Hilton*'s approach, leave open the possibility that a more liberal approach—one that would require a showing merely that the defendant had acted without a reasonable basis—might also be appropriate. See *Hanes v. Zurick*, 578 F.3d 491, 494 (7th Cir. 2009); *United States v. Moore*, 543 F.3d 891, 898-99 (7th Cir. 2008), and cases cited there.

Some cases in other circuits deem it an open question after *Olech* whether animus or, more broadly, improper personal motivations are required in a class-of-one case. See *Cordi-Allen v. Conlon*, 494 F.3d 245, 250 n. 3 (1st Cir. 2007); *Jicarilla Apache Nation v. Rio Arriba County*, 440 F.3d 1202, 1210 (10th Cir. 2006); *Hayut v. State University of New York*, 352 F.3d 733, 754 n. 15 (2d Cir. 2003); *DeMuria v. Hawkes*, 328 F.3d 704, 707 n. 2 (2d Cir. 2003); *Giordano v. City of New York*, 274 F.3d 740, 743 (2d Cir. 2001). Other cases hold that such motivations aren't required: *Gerhart v. Lake County*, 637 F.3d 1013, 1022 (9th Cir. 2011); *Phillips v. County of Allegheny*, 515 F.3d 224, 243 (3d Cir. 2008); *Stotter v. University of Texas*, 508 F.3d 812, 824 n. 3 (5th Cir. 2007); *Scarbrough v. Morgan County Board of Education*, 470 F.3d 250, 261 (6th Cir. 2006); *TriHealth, Inc. v. Board of Commissioners*, 430 F.3d 783, 788 (6th Cir. 2005); *Boone v. Spurgess*, 385 F.3d 923, 932 (6th Cir. 2004); *Cobb v. Pozzi*, 363 F.3d 89, 110 (2d Cir. 2004). And still others merely intone the formula recited by the

Supreme Court in *Olech*: *Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 140 (2d Cir. 2010); *Renchenski v. Williams*, 622 F.3d 315, 337-38 (3d Cir. 2010); *Grider v. City of Auburn*, 618 F.3d 1240, 1263-64 (11th Cir. 2010); *Association of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 549 (6th. Cir. 2007); *Griffin Industries, Inc. v. Irvin*, 496 F.3d 1189, 1202 (11th Cir. 2007); *Barstad v. Murray*, 420 F.3d 880, 884 (8th Cir. 2005); *Tri-County Paving, Inc. v. Ashe County*, 281 F.3d 430, 439 (4th Cir. 2002); *Costello v. Mitchell Public School Dist. 79*, 266 F.3d 916, 921 (8th Cir. 2001).

Judge Wood has made a commendable effort to harmonize the diverse strains of class-of-one jurisprudence. The key passage in her dissenting opinion is the following. We italicize the words and phrases in the opinion that persuade us that the effort at harmonization falls short:

> a putative class-of-one complainant faces *a much higher burden* to show that the exercise of that discretion was *irrational*. This, we believe, is what our court and others have been driving at ever since *Olech* and *Engquist* in the suggestions that animus, or *malice*, or *lack of any possible legitimate state purpose*, plays a *part* in class-of-one cases. Those *motive* elements are *not always necessary*, as *Olech* illustrates, and indeed, it is not clear to us that Judge Posner's separate opinion even takes that position. Nor should animus (or *something similar*) be seen as an alternative to a showing of *irrationality*. Instead, in the cases that do not rest on the state's *failure to follow a clear standard*, the

> plaintiff has the burden of showing in the com-
> plaint some plausible reason to think that *inten-
> tional and irrational* discrimination has occurred.
> Pleading animus or *improper purpose* will *often* be
> an *effective* way to accomplish that goal.

So the police must be "irrational," and the harm they cause the plaintiff must be "intentional," actuated by "animus," or by "malice" (which need not mean the same thing as "animus"), or must "lack . . . any possible legitimate state purpose" (but how does that differ from being "irrational," and in what sense is it a "motive element"?), and amount to "irrational discrimination."

Judge Wood and the judges who have joined her opinion are aware that so loose a standard could invite a flood of cases, because the opinion imposes a high burden of proof on plaintiffs (though not on this plaintiff) and requires that the complaint itself "show . . . some plausible reason to think that intentional, irrational discrimination has occurred." But an open-ended list of factors for judges and jurors to mull over, a pile-up of adjectives, an invitation to consider unnamed further possibilities for establishing liability, and on top of all this a pleading requirement that may go beyond *Iqbal* yet is not applied to this case—so ad hoc an approach leaves the law of class-of-one discrimination in the confusion in which we found it when we agreed to hear the case en banc.

We need to simplify and we could do so by holding that a state actor commits class-of-one discrimination

only when he intends to discriminate in the sense of intending to treat a person differently from other persons for reasons of a personal character, that is, reasons not grounded in his public duties. *Olech* was such a case. The Village was charged with having discriminated against the Olechs in violation of its own regulation in order to punish them for having sued it and won. The discrimination not only had no justification; it had been motivated by a desire for vengeance, which was no part of the Village officials' public duty, as they well knew. In this case, in contrast, a plaintiff complains about govern-mental conduct that is unavoidably highly discretionary, and to a degree almost random, as is commonplace at the lower rungs of law enforcement. Suppose a police car is lurking on the shoulder of a highway in a 45 m.p.h. zone, a car streaks by at 65 m.p.h., and the police do nothing. Two minutes later a car streaks by at 60 m.p.h. and the police give that driver a ticket. Can the second driver complain of a denial of equal protection if the police cannot come up with a rational explanation for why they ticketed him even though he wasn't driving as fast as the first driver? If so, the courts will be swamped with class-of-one cases remote from the aims of the equal protection clause and unmanageable as a matter of judicial administration. Or suppose that an asylum officer, after interviewing an applicant for asylum, rec-ommends that the applicant be turned down, while another asylum officer, in (as he knows) a rationally indistinguishable case, recommends that "his" applicant be granted asylum. Like situations are thus being treated differently; that is what unequal treatment, often called by lawyers and judges "irrational," means. Both asylum

officers are doing their duty, though the result is an irrational difference in treatment. Neither is guilty of discrimination.

We can learn from *Hilton*'s facts. For seven years Hilton and his neighbors in an apartment complex had been locked in a feud that began when neighbors saw him beating his Rottweiler puppy. He was cited for cruelty to animals and fined $500. Since that initial *contretemps* with his neighbors he had been cited or arrested some fifteen times on neighbors' complaints for such transgressions as disorderly conduct, battery, and violating noise ordinances. His suit charged that the police had not been evenhanded in arbitrating, as it were, his feud with his neighbors. He had complained to the police many times. They had responded to all the complaints but had acted on only one. That was when he complained that a neighbor's dog was barking loudly—and the police cited Hilton for disorderly conduct as well as the neighbor. The police had, in short, he claimed, enforced the law one-sidedly. And likewise in the present case: law enforcement authorities are accused of having refused to take seriously a complaint of gang violence in the form of "loud illegal car & motorcycle mufflers," and a police lieutenant is alleged to have told the plaintiff that he would "take no action on your complaint because you are crazy."

The challenge is to find amidst the welter of trivial "irrationalities" in discretionary actions by frontline public employees acts of discrimination of a character to warrant classification as denials of equal protection.

A state trooper notices two cars being driven above the speed limit. One is a beautiful red convertible—an Aston Martin DBS Volante. The other, which is not speeding quite so fast, is a Toyota Prius. The trooper has never seen such a beautiful car as the Aston Martin (it *should* be beautiful—the sticker price is $290,861), so he signals the driver to pull over so that he can get a better look at the car, and, awed, lets the driver continue on his way without giving him a ticket. Later the trooper catches up with the driver of the Prius and, unimpressed, tickets him. The trooper's behavior is not admirable, but it is not unrelated to his public duties; the Prius *was* speeding, albeit not so fast as the Aston Martin, and the trooper was therefore acting in accordance with his duties in ticketing the Prius's driver.

Or suppose a state trooper decides to economize on having to think by ticketing only speeders in blue cars. He is not vindictive; he has nothing against people who drive blue cars; he doesn't want to harm anyone; he's not going to issue more tickets; all his victims are guilty; none is a victim of unjustifiable harm; the trooper has just decided to rest his brain. His motive is irresponsible—when drivers get wind of it, those who don't drive blue cars will speed more. So should an enterprising lawyer be encouraged to file a class action suit on behalf of drivers of blue cars who have been ticketed by this officer? (It would be a class-of-one suit even though there was more than one claimant; "class of one" refers not to the number of plaintiffs but to the fact that the plaintiff or plaintiffs is not suing as a member of an identifiable group, such as a race or a

gender, or for that matter an industry. *Engquist v. Oregon Dep't of Agriculture*, 553 U.S. 591, 601 (2008).) If a driver complains to the police commissioner about the state trooper, and the commissioner says he can't be bothered with the matter, is the commissioner guilty of a violation of equal protection because he has exhibited reckless indifference to his subordinate's conduct? Or the municipality that employs the commissioner and has authorized him to decide such matters?

Random can be rational: a random audit by the Internal Revenue Service should not be thought "arbitrary" in a pejorative sense, though it *is* arbitrary in the sense that identically situated taxpayers who are not audited are being treated differently (ex post, not ex ante) from those who are. Randomization can be a proper and indeed indispensable tool of government, given limited governmental resources, as the dissenting opinion recognizes. (It can also be monstrous, as in decimation—the practice of killing every tenth soldier in a mutinous unit.) The examples we have given involve police behavior that while not vicious, not malicious, is not random, being instead actuated by personal motives that should not influence the performance of public duties. Yet it would be silly to make constitutional cases out of them, for remember that everyone ticketed in the examples deserved to be ticketed.

But "silliness" is not an operable standard; and while the courts generally agree that only *egregious* class-of-one cases should be actionable in the name of the Constitution, egregiousness is not an operable standard either

but instead is a version of "I know it when I see it." *Jacobellis v. State of Ohio*, 378 U.S. 184, 197 (1964) (concurring opinion). The principle *de minimis non curat lex* is applicable to constitutional cases, *Commodity Futures Trading Commission v. Schor*, 478 U.S. 833, 856 (1986) (separation of powers); *United States v. Jacobsen*, 466 U.S. 109, 125 (1984) (Fourth Amendment); *Ingraham v. Wright*, 430 U.S. 651, 674 (1977) (procedural due process); *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) (freedom of speech), and could be used as a limiting principle, maybe in the speeding-ticket cases, though not in the present case, in which the plaintiff claims to have been driven out of town by the refusal of the police to respond to his complaint.

One is tempted to throw up one's hands and banish challenges to police responses to complaints, and to other police investigatory decisions, from the class-of-one domain altogether, on the analogy of the Supreme Court's decision in *Engquist v. Oregon Dep't of Agriculture*, *supra*. The specific question in *Engquist* was whether public employees should be allowed to bring class-of-one suits against their employers; the Court held they could not. The Court went out of its way to discuss other situations in which low-level officials make discretionary rather than rule-based decisions:

> Recognition of the class-of-one theory of equal protection on the facts in *Olech* was not so much a departure from the principle that the Equal Protection Clause is concerned with arbitrary government classification, as it was an applica-

tion of that principle. That case involved the government's regulation of property. Similarly, the cases upon which the Court in *Olech* relied concerned property assessment and taxation schemes. We expect such legislative or regulatory classifications to apply "without respect to persons," to borrow a phrase from the judicial oath….

What seems to have been significant in *Olech* and the cases on which it relied was the existence of a clear standard against which departures, even for a single plaintiff, could be readily assessed. There was no indication in *Olech* that the zoning board was exercising discretionary authority based on subjective, individualized determinations—at least not with regard to easement length, however typical such determinations may be as a general zoning matter. Rather, the complaint alleged that the board consistently required only a 15-foot easement, but subjected Olech to a 33-foot easement. This differential treatment raised a concern of arbitrary classification, and we therefore required that the State provide a rational basis for it….

There are some forms of state action, however, which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be "treated alike, under like circumstances and conditions" is not violated when one person is treated differently

from others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

Suppose, for example, that a traffic officer is stationed on a busy highway where people often drive above the speed limit, and there is no basis upon which to distinguish them. If the officer gives only one of those people a ticket, it may be good English to say that the officer has created a class of people that did not get speeding tickets, and a "class of one" that did. But assuming that it is in the nature of the particular government activity that not all speeders can be stopped and ticketed, complaining that one has been singled out for no reason does not invoke the fear of improper government classification. Such a complaint, rather, challenges the legitimacy of the underlying action itself—the decision to ticket speeders under such circumstances. Of course, an allegation that speeding tickets are given out on the basis of race or sex would state an equal protection claim, because such discriminatory classifications implicate basic equal protection concerns. But allowing an equal protection claim on the ground that a ticket was given to one person and not others, even if for no discernible or articulable reason,

would be incompatible with the discretion inherent in the challenged action. It is no proper challenge to what in its nature is a subjective, individualized decision.

553 U.S. at 602-04 (citations omitted).

The quoted passage extends the Court's analysis (though not its holding) from public employees supervisors to the police, who are engaged in "discretionary decisionmaking based on a vast array of subjective, individualized assessments," and who therefore should not be liable for equal protection violations unless they base decisions on discriminatory classifications such as race or sex that "implicate basic equal protection concerns." Employment decisions, the Court pointed out, "are quite often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify . . . . [T]reating seemingly similarly situated individuals differently in the employment context is par for the course." *Id*. at 604. As it is in policing.

When the Court went on to say that "an allegation of arbitrary differential treatment could be made in nearly every instance of an assertedly wrongful employment action . . . on the theory that other employees were not treated wrongfully," that "on Engquist's view, every one of these employment decisions by a government employer would become the basis for an equal protection complaint," and that "the practical problem with allowing class-of-one claims to go forward in this context is not that it will be too easy for plaintiffs to prevail, but that governments will be forced to defend

a multitude of such claims in the first place, and courts will be obliged to sort through them in a search for the proverbial needle in a haystack," *id.* at 608, it might have been speaking about this case. Other decisions make similar points. See, e.g., *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1216-18 (10th Cir. 2011). Two recent decisions apply *Engquist*'s bar to class-of-one suits to discretionary action by state officials outside the employment context. *Towery v. Brewer*, 672 F.3d 650, 660-61 (9th Cir. 2012) (per curiam); *Novotny v. Tripp County*, 664 F.3d 1173, 1179 (8th Cir. 2011).

As Professor Powell has said, "It is easy to imagine reading the Court's holding in *Engquist* as a strategic decision, intended to keep the judiciary out of an area in which it would be extremely difficult for courts to vindicate the constitutional norm without undue interference in the functioning of the political branches. Without a 'clear standard' to apply to personnel decisions, courts would find themselves simply second-guessing the executive or administrative officials who made the decisions on a discretionary basis in the first place, thereby 'undermin[ing] the very discretion that such state officials are entrusted to exercise.' The point of *Engquist*, on this reading, would not be that government is constitutionally free to make employment decisions based on whim or animus toward an individual employee, but rather that given the difficulty of ascertaining or even articulating the basis for many such decisions, it is preferable for the courts to abstain. Such deliberate judicial underenforcement would leave implementation of the norm to the political branches, not decree that

what would be an illegitimate basis for governmental action in any other circumstance is constitutionally acceptable in government personnel decisions." Powell, *supra*, 86 *Wash. L. Rev.* at 264. *Engquist* notes that "public employees typically have a variety of protections from just the sort of personnel actions about which Engquist complains, but the Equal Protection Clause is not one of them." 553 U.S. at 609. Americans have an even greater variety of protections against police misconduct, many of them of constitutional dignity.

Just months after the *Engquist* decision, our court, in *United States v. Moore*, *supra*, 543 F.3d at 899-901, held that just as public employees cannot bring class-of-one cases against their employer, so also prosecutorial and sentencing discretion is not to be fettered by class-of-one suits. (For this reason the plaintiff in this case cannot get to first base by arguing that the police should have gone after the bikers who he claims were making his life unbearable—the decision whether to arrest is a form of prosecutorial decision.) There is arbitrary variance among prosecutors in deciding whether to prosecute a particular criminal, and among judges in deciding what sentence to impose on a particular criminal; there are also inconsistent prosecutorial decisions by individual prosecutors within a department and inconsistent sentences imposed by individual judges within a judicial system and indeed in the same court. Legally enforceable limitations on arbitrariness, such as uniform prosecutorial policy within a jurisdiction and standardized sentencing guidelines based on penological research, have largely been rejected. There

would be chaos if persons charged with crime could base a defense on the ground that a similarly situated criminal suspect had not been charged, or if a person convicted of crime could knock out his sentence by showing that a similarly situated criminal had received a more lenient sentence, whether from the same or a different judge. Class-of-one claims cannot be interposed as defenses to criminal prosecutions, convictions, or sentences.

What unites the public-employer, prosecutorial discretion, and sentencing discretion cases at the deepest level of policy is not the existence of alternative remedies or the absence of harmful discrimination. It is the impediment to efficiency in government that would be created by allowing class-of-one litigation in areas in which frontline public officers—whether supervisors and other management-level personnel in public agencies, or prosecutors, or trial judges—exercise discretionary authority guided unavoidably by subjective, individualized factors that are bound to create disparate treatment. Class-of-one liability in such circumstances would not eliminate the disparities, because they are inherent in the exercise of discretion in such activities, but would foment litigation and disrupt law enforcement; some injustices would be corrected, but at an unacceptable price.

Police exercise a good deal of discretion, and not only in deciding which drivers to ticket for speeding. Police supervisors have to make decisions about the allocation of police resources across neighborhoods, commercial

establishments, residences, and particular individuals, and about whom to investigate on suspicion of criminal activity, whom to arrest, whom merely to warn. Many of their decisions are made in emotional settings, involving angry and frightened people, and after the fact it is easy to point to mistakes. The police in this case decided not to take seriously Del Marcelle's complaint about being harassed by motorcycle gangs. They thought him a nutcase. That is a judgment police officers have constantly to make. It is not a judgment that the federal courts should second guess in the name of equal protection. Should a federal judge order the police to investigate Del Marcelle's charges? To arrest bikers whose motorcycles lack mufflers? To assign police officers to watch Del Marcelle's house?

The *Geinosky* case that we cited earlier makes a nice contrast to this one. The plaintiff received 24 totally meritless parking tickets (often in circumstances in which it was physically impossible for the plaintiff to have committed a parking violation) in quick succession from police officers who appear to have been in cahoots with his estranged wife. We said that "absent a reasonable explanation, and none has even been suggested yet, the pattern adds up to deliberate and unjustified official harassment that is actionable under the Equal Protection Clause*.*" *Geinosky v. City of Chicago, supra*, 675 F.3d at 745. The defendants intentionally subjected the plaintiff to harm that they knew had no legal justification. Such a claim should survive the concerns expressed in *Engquist*.

But the example must not be generalized to every case in which the exercise of discretion by frontline public officers results in arbitrary "classification" (in equal-protection speak) of persons otherwise similarly situated. A particular 911 call—say, reporting an auto theft or a burglary—may receive prompt attention, while another call reporting the same kind of crime a few blocks away is ignored. Probably there's no rational basis for the difference in treatment. It cannot realistically be thought to exemplify "efficient systemic randomization." But such differences are an unavoidable feature of discretionary administration of systems of government service, such as policing. As the *Engquist* decision points out, "it is no proper challenge to what in its nature is a subjective, individualized decision that it was subjective and individualized." 553 U.S. at 604.

The rational-basis test is an ingenious device for uncovering unconstitutional discrimination in legislative classifications. Reluctant to inquire into the personal motivations of lawmakers, judges ask instead whether an objective basis can be posited for a statutory classification challenged as discriminatory. But when "discrimination" is the norm because the "classification" is not legislative but instead is made ad hoc by frontline public officers, "discrimination" can't by itself be the criterion for violation of the equal protection clause. More is needed in a suit challenging discretionary conduct as discriminatory and it makes sense that the more should relate to the public officer's motivations, subjective though they are. For in such a case the claim depends on proof that the defendant singled out a private citizen for unfavorable

treatment, which is different from a difference in treatment that arises incidentally as the inevitable consequence of the conferral of discretion on low-level officials. Inability to articulate a rationally acceptable reason for the difference is not a meaningful way to identify intentional discrimination.

This case is thus on the other side of the line from *Geinosky*, where singling out for purposes unrelated to official duty could readily be inferred. Which is not to say that proof of a bad motive is alone sufficient to establish liability in a class-of-one case. The plaintiff must plead and prove *both* the absence of a rational basis for the defendant's action *and* some improper personal motive (which need not be hostility, but could be, for example, corruption) for the differential treatment. Thus, as we said earlier, our proposed standard requires the plaintiff to plead and prove *intentional discriminatory treatment* that *lacks any justification based on public duties* and that there be some *improper personal motive* for the discriminatory treatment. Some discretionary decisions will fail the rational-basis test, standing alone, but nonetheless should not be actionable because a degree of arbitrariness is inescapable in discretionary decisions by frontline government personnel. That is why we suggest that more must be shown—the personal motive to which we've referred. A bare allegation of bad motive, however, is not enough. In this case, in contrast to *Geinosky*, there is an allegation of arbitrariness, but not of improper motive. The police ignored the plaintiff's complaints of harassment by bikers on the ground that he was off his rocker. They failed to

help him, but the complaint does not allege that they wanted to treat him worse than other citizens because of some personal motive. Rightly or wrongly they thought him a paranoid pest obsessed with motorcycle gangs.

To let the plaintiff plead over would not sort well with insistence that the class-of-one domain should be narrowly construed when a suit attacks discretionary action at street level. The suit was rightly dismissed.

EASTERBROOK, *Chief Judge*, concurring in the judgment. My colleagues debate the role of motive and intent in class-of-one suits. Judge Posner (for four judges) and Judge Wood (for five) offer slightly different understandings of the role motive or intent should play in such suits. I think that it has no role at all.

*Village of Willowbrook v. Olech*, 528 U.S. 562 (2000), holds that the rational-basis test applies to class-of-one claims. That test asks whether a rational basis can be *conceived*, not whether one is established on the record or occurred to a defendant. See, e.g., *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993); *Railroad Retirement Board v. Fritz*, 449 U.S. 166 (1980). The Justices who dissented in *Engquist v. Oregon Department of Agriculture*,

553 U.S. 591 (2008), contending that a class-of-one claim should have been allowed there, recognized this, writing: "But for this disclaimer [by defendants, who denied having any reason at all], the district court could have dismissed the claim if it discerned 'any reasonably conceivable state of facts that could provide a rational basis for the [State's actions],' even one not put forth by the State." 553 U.S. at 612 n. 2 (citation omitted; second bracketed phrase in original).

It is easy to conceive two rational bases for defendants' treatment of Del Marcelle. First, they had limited enforcement resources and could not fully investigate all complaints. Second, defendants may have concluded that Del Marcelle was imagining or exaggerating the problems he reported. Under the rational-basis test, either possibility requires judgment in defendants' favor. There is no need for inquiry into the defendants' state of mind. The upshot of today's decision, however, is that something other than the normal rational-basis test applies to class-of-one claims applies in the seventh circuit. That is the very conclusion by this court that led to the grant of certiorari in *Olech*. If Justices thought they had disapproved our local rational-basis-plus-intent approach, that message has not been received.

I do not deny that intent can matter to equal-protection analysis. Rules based on suspect classes such as race are subject to strict scrutiny. State and local governments may try to disguise their criteria of decision by adopting rules that have the appearance but not the reality of neutrality. The Supreme Court has held that

the adverse impact of neutral rules does not change the standard from rational basis to strict scrutiny—but that proof of intent to discriminate on a ground such as race or sex can do so. See, e.g., *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979); *Washington v. Davis*, 426 U.S. 229 (1976). If Del Marcelle were arguing that defendants held his race, sex, or religion against him, and were seeking heightened scrutiny, intent would matter. He does not contend, however, that defendants engaged in class-based discrimination; that's why this is a class-of-one case. The only proper use of intent in a class-of-one case is to show that discrimination exists—in other words, to distinguish between disparate treatment and disparate impact. Yet defendants do not say that this is a disparate-impact case (perhaps because they tried but failed to arrest or ticket the bikers) rather than a disparate-treatment one. That makes motive and intent irrelevant to this litigation.

What's more, I do not think that the class-of-one theory itself has any role to play. No public employee attacked or injured Del Marcelle. His losses stem from private aggression by the bikers, which public officials failed to prevent. Inability of the police to show a rational basis for each decision about who is arrested or ticketed (compared with persons not arrested or ticketed) should not expose them to damages.

Del Marcelle is not entitled to an order requiring arrest or prosecution of the bikers, or to damages because of public officials' decision not to do so. *Castle*

*Rock v. Gonzales*, 545 U.S. 748 (2005); *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989); *Leeke v. Timmerman*, 454 U.S. 83 (1981); *Linda R.S. v. Richard D.*, 410 U.S. 614 (1973). The Constitution does not create a general right to protection from private wrongdoers. The original meaning of the equal protection clause is that, if the police and prosecutors protect white citizens, they must protect black citizens too, but Del Marcelle does not allege racial discrimination or any other kind of class-based discrimination. His contention is that the police failed to protect him, personally, from private aggression that targeted him, personally. *DeShaney* shows that this is not a good constitutional claim.

This leaves an argument that the police violated the equal protection clause, even though not the due process clause, by issuing citations to Del Marcelle but not the bullies. That is a bad approach. It is inconceivable that the plaintiff could have prevailed in either *Castle Rock* or *DeShaney* by replacing a due-process theory with a class-of-one equal-protection theory; the claims advanced in those cases functionally *were* class-of-one claims, yet the plaintiffs lost. It was a premise in both *Castle Rock* and *DeShaney* that state officials had protected some persons but not the plaintiffs, who contended that they should have received the same benefit yet were denied it for no reason (*i.e.*, without a rational basis). That's the same sort of claim Del Marcelle makes. He loses for the same reasons Gonzales and DeShaney lost.

Discrimination against members of a suspect class is actionable notwithstanding *Castle Rock* and *DeShaney*,

but class-of-one distinctions are not. As for non-prosecution of the predators, the Court wrote in *Linda R.S.* that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." 410 U.S. at 619. That is a limit on standing; *Linda R.S.* holds that there is no justiciable controversy, which knocks out *all* substantive legal theories. Del Marcelle thus needs to show how he was injured by what the defendants did *to* him, rather than by what they didn't do to other people or what they didn't do *for* him.

Del Marcelle does not tell us, however, how the citations injured him. Any injury was meted out by the bikers, not by the police, which makes it hard to see how a claim centered on the citations has any prospect. If the citations were dismissed without trial or penalty, Del Marcelle is uninjured when compared with a world in which no one was prosecuted, and thus no discrimination could have occurred. If the citations were adjudicated, and Del Marcelle prevailed, again he is uninjured. If they were adjudicated, and he lost, then preclusion blocks this civil suit. How could Del Marcelle get damages on account of a potential defense that wasn't raised, let alone a defense that was raised and rejected?

Put lack of injury, and a potential defense of preclusion, to the side. There is no constitutional problem. Persons accused of wrongdoing can't make class-of-one defenses to criminal charges. See, e.g., *United States v. Armstrong*, 517 U.S. 456, 464 (1996); *United States v. Moore*, 543 F.3d 891, 901 (7th Cir. 2008). *Armstrong* holds that a defense of selective prosecution is limited to racial discrimina-

tion or other class-wide inequality, which must be shown by strong evidence before courts can allow discovery. So if the citations Del Marcelle received were followed by prosecution, he could not defend by contending that he was being treated worse than the bikers. That's not class-based discrimination.

If "I was treated worse than the bikers" is not a defense on the merits, how can it be a basis of damages against officers who issue citations that get proceedings under way? No decision of which I am aware holds that it violates the Constitution to initiate a criminal prosecution (or a civil-penalty proceeding) that can lead to a valid conviction, whether or not the same officers failed to arrest or ticket third parties. Quite the contrary, many cases hold that police cannot be ordered to pay damages even when the defendant prevails in a prosecution (or none is filed). For example, *Hartman v. Moore*, 547 U.S. 250 (2006), holds that probable cause for an arrest knocks out a claim that the arrest violated the person's rights under the first amendment. Probable cause is objective; the officers' motives, beliefs, and so on, don't matter and cannot create liability. *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080-83 (2011). That's why probable cause blocks contentions that the officers had ulterior goals (such as favoring the bikers over Del Marcelle). Likewise probable cause prevents an award of damages under the fourth amendment for wrongful arrest. Indeed, *Hunter v. Bryant*, 502 U.S. 224 (1991), holds that arresting officers can't be liable if a reasonable person could have concluded that probable cause exists, even if it doesn't.

Suppose the officers had placed Del Marcelle under arrest instead of just issuing citations. There is probable cause or there isn't. If there is probable cause, the officers can't be held liable. If there is not probable cause, and an objectively reasonable officer would not have believed that probable cause exists, then the officer is liable under the fourth amendment. *Graham v. Connor*, 490 U.S. 386 (1989), completes the picture by holding that the fourth amendment is the *only* source of rules governing the validity of arrests. *Graham* concludes, in particular, that an arrested person can't present a claim under the due process clause. That must be true for a claim under the equal protection clause too, just as it is true (see *Hartman*) for a claim under the first amendment. Police need not arrest everyone who committed the same offense; selectivity is normal—and is proper, unless based on a forbidden classification such as race. Probable cause for arrest is a complete defense to an argument that other similarly situated persons were not arrested.

Apparently Del Marcelle was not arrested; the police just wrote a few tickets. How can the police be more exposed to awards of damages for writing tickets than for making full custodial arrests? That would create an incentive for needless arrests in order to create a shield from liability. Often people contend that police should be compelled to write tickets without arresting. *Atwater v. Lago Vista*, 532 U.S. 318 (2001), holds that the Constitution allows police to make custodial arrests for offenses punishable only by fines. That the defendants left Del Marcelle at liberty cannot be their undoing.

Class-of-one liability for the toleration of private violence is blocked by *Castle Rock* and its predecessors; liability for arrests based on probable cause is blocked by *Graham* no matter what legal theory the plaintiff invokes; liability for criminal (and civil) prosecutions is blocked by *Armstrong*. Those decisions address the merits and cannot be circumvented by observing that police officers lack prosecutorial immunity. Citations, whether issued by an officer on the beat or a lawyer in an office, just get a legal process under way; they do not themselves cause injury and should not be a basis of liability no matter why someone writes them (or fails to write others). State law can create liability in tort (think malicious prosecution or abuse of process), but the Constitution is not a fount of national tort law, as the decisions I've mentioned show.

Any doubt on this score is stilled by *Engquist*. Although that case's holding is limited to public employees, its rationale is not.

Recognition of the class-of-one theory of equal protection on the facts in *Olech* was not so much a departure from the principle that the Equal Protection Clause is concerned with arbitrary government classification, as it was an application of that principle. That case involved the government's regulation of property. Similarly, the cases upon which the Court in *Olech* relied concerned property assessment and taxation schemes. We expect such legislative or regulatory classifications to apply "without respect to per-

sons," to borrow a phrase from the judicial oath. See 28 U.S.C. § 453. As we explained long ago, the Fourteenth Amendment "requires that all persons subjected to . . . legislation shall be treated alike, under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed." *Hayes v. Missouri*, 120 U.S. 68, 71-72 (1887). When those who appear similarly situated are nevertheless treated differently, the Equal Protection Clause requires at least a rational reason for the difference, to assure that all persons subject to legislation or regulation are indeed being "treated alike, under like circumstances and conditions." Thus, when it appears that an individual is being singled out by the government, the specter of arbitrary classification is fairly raised, and the Equal Protection Clause requires a "rational basis for the difference in treatment." *Olech*, 528 U.S., at 564.

What seems to have been significant in *Olech* and the cases on which it relied was the existence of a clear standard against which departures, even for a single plaintiff, could be readily assessed. There was no indication in *Olech* that the zoning board was exercising discretionary authority based on subjective, individualized determinations—at least not with regard to easement length, however typical such determinations may be as a general zoning matter. Rather, the complaint alleged that the board consistently required only a 15-foot easement, but subjected Olech to a 33-

foot easement. This differential treatment raised a concern of arbitrary classification, and we therefore required that the State provide a rational basis for it. . . .

There are some forms of state action, however, which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be "treated alike, under like circumstances and conditions" is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

Suppose, for example, that a traffic officer is stationed on a busy highway where people often drive above the speed limit, and there is no basis upon which to distinguish them. If the officer gives only one of those people a ticket, it may be good English to say that the officer has created a class of people that did not get speeding tickets, and a "class of one" that did. But assuming that it is in the nature of the particular government activity that not all speeders can be stopped and ticketed, complaining that one has been singled out for no reason does not

invoke the fear of improper government classi-
fication. Such a complaint, rather, challenges
the legitimacy of the underlying action itself—the
decision to ticket speeders under such circum-
stances. Of course, an allegation that speeding
tickets are given out on the basis of race or sex
would state an equal protection claim, because
such discriminatory classifications implicate
basic equal protection concerns. But allowing
an equal protection claim on the ground that a
ticket was given to one person and not others,
even if for no discernible or articulable reason,
would be incompatible with the discretion
inherent in the challenged action. It is no proper
challenge to what in its nature is a subjective,
individualized decision that it was subjective
and individualized.

This principle applies most clearly in the employ-
ment context, for employment decisions are
quite often subjective and individualized, resting
on a wide array of factors that are difficult to
articulate and quantify. As Engquist herself points
out, "[u]nlike the zoning official, the public em-
ployer often must take into account the individual
personalities and interpersonal relationships of
employees in the workplace. The close relationship
between the employer and employee, and the
varied needs and interests involved in the em-
ployment context, mean that considerations such
as concerns over personality conflicts that would
be unreasonable as grounds for 'arm's-length'

government decisions (*e.g.*, zoning, licensing) may well justify different treatment of a public employee." Unlike the context of arm's-length regulation, such as in *Olech*, treating seemingly similarly situated individuals differently in the employment context is par for the course.

Thus, the class-of-one theory of equal protection—which presupposes that like individuals should be treated alike, and that to treat them differently is to classify them in a way that must survive at least rationality review—is simply a poor fit in the public employment context. To treat employees differently is not to classify them in a way that raises equal protection concerns. Rather, it is simply to exercise the broad discretion that typically characterizes the employer-employee relationship. A challenge that one has been treated individually in this context, instead of like everyone else, is a challenge to the underlying nature of the government action.

553 U.S. at 602-05 (internal citations omitted without indication). This passage tells us that public employment is just an *example* of the situations in which the Constitution tolerates selective action, without requiring public officials to explain to a court's satisfaction why they exercised discretion in favor of one person and against another. Issuing citations is another example. And although there is a rational basis for letting most speeders go, *Engquist* did not rely on that proposition. Nor did it say that difficulty of proof explains why unequal enforce-

ment is allowed. The language I have quoted says that issuing particular law-enforcement citations is outside the scope of class-of-one analysis because law enforcement is permissibly discretionary.

*Engquist* shows that discretionary decisions in law enforcement are not amenable to class-of-one analysis. See *Flowers v. Minneapolis*, 558 F.3d 794, 799-800 (8th Cir. 2009) ("a police officer's investigative decisions . . . may not be attacked in a class-of-one equal protection claim"). A contrary conclusion would effectively constitutionalize the Administrative Procedure Act and open all public officials' decisions to judicial review to determine whether they are arbitrary or capricious. (A capricious decision must lack a rational basis.) Indeed, in the name of the equal protection clause Del Marcelle asks us to go beyond the APA by ruling that (a) the remedy is damages from the decisionmaker's pocket, not just an order setting aside the arbitrary or capricious decision, and (b) the initiation of a process, and not just the outcome, is subject to judicial review.

One of the APA's basic rules is that review is limited to the agency's final decision. Issuing a complaint is not reviewable even though it portends a multi-year adjudicative process that may cost millions to resolve. *FTC v. Standard Oil Co.*, 449 U.S. 232 (1980). See also *Sackett v. EPA*, 132 S. Ct. 1367, 1371-72 (2012) (discussing what makes an act "final" under the APA). If the target of the complaint prevails before the agency, there will never be judicial review, and the private party must bear its own attorneys' fees under the

American Rule. An argument that similarly situated persons have not been subjected to this costly process does not authorize judicial review of the complaint—indeed, does not authorize a court to set aside the final decision either. *FTC v. Universal-Rundle Corp.*, 387 U.S. 244 (1967); *Moog Industries, Inc. v. FTC*, 355 U.S. 411 (1958). Thus there is no class-of-one doctrine in federal administrative law, any more than in criminal law. But under Del Marcelle's approach there is a constitutional class-of-one doctrine, enforced by awards of damages, regulating the decision by police officers to issue a ticket initiating a legal inquiry—and perhaps administrative prosecutors at the FTC to issue a complaint. If judges are going to apply the APA to state and municipal governments through the Constitution, which we shouldn't, we certainly should not go beyond the APA by creating personal liability for issuing a complaint or citation to one party but not another said to be similarly situated.

Del Marcelle cannot prevail whether his complaint concerns failure to prosecute the bikers or the tickets he received, and whether or not a class-of-one theory is available. I therefore concur in the decision affirming the judgment of the district court.

WOOD, *Circuit Judge*, with whom FLAUM, ROVNER, WILLIAMS, and HAMILTON, *Circuit Judges*, join, dissenting. Ever since the Supreme Court confirmed in *Village of Willowbrook v. Olech,* 528 U.S. 562 (2000) (per curiam), that the Equal Protection Clause of the Constitution extends to "class of one" cases, courts have been grappling with what a plaintiff must plead, and ultimately show, to prevail in such an action. The full court decided to hear this case *en banc* in the hopes that we might bring some clarity to the matter. The case before us was brought under 42 U.S.C. § 1983 *pro se* by Lewis Del Marcelle (and originally his wife, but she is no longer involved) against several state defendants for alleged discrimination. The district court dismissed Del Marcelle's complaint for failure to state a claim on which relief may be granted. Five judges have concluded that Del Marcelle's complaint not only fails to meet the standard for pleading a class-of-one case, but that it cannot be salvaged. Five other judges, myself included, believe that his current complaint is legally insufficient, but that he should be given a chance to replead under the correct standard. Beyond that bottom-line disagreement, there is a more fundamental difference of opinion about the proper standard in this kind of case. A plurality consisting of five members of the court agrees with the standard set forth in this opinion; four members have adopted the standard described in Judge Posner's concurrence; and Chief Judge Easterbrook has offered yet another approach. Because we are equally divided, none of these opinions has precedential significance: we must affirm the judgment of the district court

by an equally divided court. Five judges of this court dissent from that result, for the reasons set forth in this opinion.

# I

We accept the account of the facts set forth in Del Marcelle's complaint, as helpfully summarized by the outstanding counsel the court recruited to assist him before the *en banc* court. (Naturally we do not vouch for any of these facts; we simply follow the accepted rules for evaluating complaints under Federal Rule of Civil Procedure 12(b)(6).) For over 20 years, the Del Marcelles have lived in Glenmore, Wisconsin, a town located in rural southeastern Brown County. (Packers fans will know that Lambeau Field is located in Brown County's seat, the City of Green Bay.) As part of the purchase of their home, they acquired rights to a liquor license associated with the Glenmore Opera House.

This case had its origin in a dispute that arose between Del Marcelle and members of a local motorcycle gang and their associates; the latter included various law enforcement personnel. The dispute escalated into active harassment and threats against the Del Marcelles from the gang members. Explosive devices were placed next to his home; his car was damaged; he suffered property theft and vandalism; and he received threatening phone calls. His wife was so distressed by this campaign that she attempted suicide. The gang also annoyed Del Marcelle with very loud muffler sounds around the clock; members would constantly ride their motorcycles past his house or idle in front of it.

One such gang member was Mark Taggart, who made loud sounds with his motorcycle right outside Del Marcelle's home, twice disrupted a wedding ceremony that the Del Marcelles were attending; he also made threatening phone calls to the home. Gang leader Karl Guns, along with others, tried to run over Del Marcelle with their cars. Guns is a relative of Officer Guns of the Brown County Sheriff's Department; Taggart is a friend or associate of other law-enforcement officials, and has been an officer himself.

The Brown County Sheriff's Department has law-enforcement responsibilities in Glenmore. Faced with this unrelenting harassment, Del Marcelle turned to the Sheriff and other governmental entities for help, filing numerous complaints. Not only were his pleas ignored, but based on competing complaints from others, the Department issued citations to Del Marcelle himself for actions he had taken in response to his mistreatment. In the end, the Del Marcelles tired of fighting. They sold their home and moved to the Village of Ashwaubenon, which is also in Brown County. But the motorcycle gangs followed them there and continued their harassment. By 2009, Taggart was living on the same street as Del Marcelle. Each of them complained about the other to the Ashwaubenon Police. Del Marcelle received a citation based on Taggart's complaints, but the police would not accept Del Marcelle's complaint; they told him that they would not help him because he was crazy.

On September 13, 2010, Lewis and Ellen Del Marcelle (acting *pro se*) filed a complaint in federal court under 42 U.S.C. § 1983 against Brown County, County Executive

Tom Hintz, the Village of Ashwaubenon, Village President Mike Aubinger, and one "unknown John Doe." Brown County and Hintz responded on September 28 with a motion to dismiss for lack of subject-matter jurisdiction and for failure to state a claim. Del Marcelle parried that motion with three exhibits filed on October 5, through which he hoped to "qualify" his complaint. A week later, the district court dismissed the complaint against all defendants, even though Ashwaubenon and Aubinger had answered without filing a Rule 12 motion. The order of dismissal gave Del Marcelle no chance to replead. Del Marcelle filed a timely notice of appeal. On April 12, 2011, this court ordered that the appeal would be taken up by the full court. The court recruited Thomas L. Shriner, Jr., of the law firm of Foley & Lardner LLP, to represent Mr. Del Marcelle. We join our colleagues in thanking Mr. Shriner, his colleague Kellen C. Kasper, and the firm for their fine work.

## II

At the time the order for *en banc* hearing was issued, the court directed the parties to supplement the briefs that had been filed by addressing the following issues:

(1) In cases of alleged "class-of-one" discrimination by front-line public officers, such as police officers, who exercise a broad discretionary authority that frequently involves subjective, ad hoc judgments, as distinct from class-of-one discrimination effectuated by legislative or regulatory classifications, what should be the governing legal standard?

(2) Specifically, what if any role should proof of "animus" play in such cases? Or should the rational-basis standard, supplemented where appropriate by the rules forbidding intentional discrimination on the basis of a protected characteristic, be the governing standard as it is when legislative or regulatory classifications, as distinct from subjective discretionary decisions, are challenged as class-of-one discrimination?

(3) What bearing on questions 1 and 2 have *Village of Willowbrook v. Olech,* 528 U.S. 562 (2000) (per curiam), and *Engquist v. Oregon Dep't of Agriculture,* 553 U.S. 591 (2008)? After *Engquist,* is even a rational basis required for subjective, discretionary decisions? Would the use of a system of random or arbitrary enforcement decisions (such as a police officer's choice about which speeders to ticket) satisfy rational-basis review, or is rational-basis review unnecessary for such decisions?

The discussion that follows draws on each of these points as needed.

## III

### A

Before turning to the heart of this case—the standard that governs class-of-one cases—we address a preliminary, but fundamental question that is raised in Chief

Judge Easterbrook's separate opinion: whether Del Marcelle has standing to pursue this claim at all. This depends on how one understands Del Marcelle's complaint. Read one way, it could be seen as an assertion of a right to have the law-enforcement authorities in Brown County take action on his behalf. As we explain, the Supreme Court has squarely rejected this theory. But read another way, Del Marcelle is not asserting a right to any particular level of law enforcement or any particular response to his complaints: he is instead saying only that he is entitled to equal treatment, whether that be bad, good, or something in between. The latter theory is a valid one. A person who has been adversely affected by discrimination has suffered injury-in-fact; the differential treatment is the cause of his injury; and that injury can be redressed either by damages or injunctive relief. No more is required to support standing. See *Camreta v. Greene,* 131 S. Ct. 2020, 2028 (2011) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992)).

It is quite possible that this limitation will significantly constrict cases like Del Marcelle's. But a review of two Supreme Court decisions—*Town of Castle Rock v. Gonzales,* 545 U.S. 748 (2005), and *Linda R.S. v. Richard D.,* 410 U.S. 614 (1973)—leaves no doubt that a plaintiff has no right to insist that the law-enforcement officers in his area arrest his tormenters. *Gonzales* involved particularly heart-wrenching facts. Respondent Jessica Gonzales had obtained a restraining order against her husband, restricting the times during which he was entitled to visit the couple's three daughters. Despite the order, he

stopped by Gonzales's house and took the three girls without permission. To make a long, sad, story short, after Gonzales frantically tried in vain to persuade the police to enforce the court order, her husband showed up at the police station in the middle of the night, started firing at the police, and was killed. The bodies of the three girls were then found in his car.

Gonzales sued the town of Castle Rock on the theory that it had violated the Due Process Clause of the Fourteenth Amendment by failing to respond properly to her repeated efforts to induce it to enforce the restraining order. The Supreme Court found that she had failed to state a claim. Even though the order contained language that made it appear to be mandatory, the Court noted that this language could not overcome "[t]he deep-rooted nature of law-enforcement discretion." 545 U.S. at 761. And even if Colorado law somehow made enforcement of the law mandatory, the Court added, "that would not necessarily mean that state law gave *respondent* an entitlement to *enforcement* of the mandate." *Id.* at 764-65. Finally, even if such an entitlement were found, the Court expressed doubt that an individual entitlement to the enforcement of a restraining order would amount to a "property" interest for purposes of the Due Process Clause. It concluded with broad language: "the benefit that a third party may receive from having someone else arrested for a crime generally does not trigger protections under the Due Process Clause, neither in its procedural nor in its 'substantive' manifestations." *Id.* at 768, referring to *DeShaney v. Winnebago C'nty Dep't of*

*Soc. Servs.,* 489 U.S. 189 (1989), and *Parratt v. Taylor,* 451 U.S. 527, 544 (1981).

*Linda R.S.* also involved a family-law matter—the more conventional problem of a parent who fails to support an illegitimate child. The Texas statute at issue imposed a support duty only on parents of legitimate children. In her lawsuit against the child's father, the mother complained that the district attorney was refusing to enforce a duty of support solely based on this statute, which she asserted was unconstitutional. The Supreme Court looked carefully at the relief the mother was seeking and concluded that she had no standing to pursue it. As it said, "in the unique context of a challenge to a criminal statute," 410 U.S. at 617, there was not enough to justify judicial intervention, even though the Court recognized the practical injury the mother had suffered. But she could not trace her injury to the nonenforcement of the Texas support statute. If she were granted relief, the only thing that would happen would be the jailing of the father; there was no guarantee that support payments would be forthcoming in the future. More generally, the Court held that its "prior decisions consistently hold that a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Id.* at 619.

*Gonzales* squarely forecloses any due process theory that might be lurking in Del Marcelle's complaint. He may have believed that the Brown County Sheriff's Department, or the police in Glenmore or Ashwaubenon,

were violating his due process rights when they did not respond to his complaints about the motorcycle gangs, but he has no legally enforceable right to have the police come and make any particular arrests. And *Linda R.S.* does the same for any claim Del Marcelle might raise to force the police or the prosecutors to pursue the gangs.

But plaintiffs are not required to plead legal theories, even in the new world of pleading that is developing in the wake of the Supreme Court's decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Instead, the complaint must simply "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." 556 U.S. at ___, 129 S. Ct. at 1949. The fact that a complaint does not state a claim under the Due Process Clause, or that a plaintiff would not have standing to seek the criminal prosecution of another, does not necessarily preclude a valid assertion of an equal protection violation. (It is worth noting, however, that Del Marcelle invoked the Equal Protection Clause several times in his *pro se* submissions.)

The distinction between a due process theory and an equal protection claim was brought out in this court's opinion in *Hilton v. City of Wheeling*, 209 F.3d 1005 (7th Cir. 2000), which noted that the right to petition government, made applicable to the states by the Fourteenth Amendment's Due Process Clause, does not carry with it any right to police assistance or other government services. But, the opinion continued:

> A complaint of unequal police protection in violation of the equal protection clause is less easily disposed of. On the one hand, the clause, concerned as it is with equal treatment rather than with establishing entitlements to some minimum of government services, does not entitle a person to adequate, or indeed to any, police protection. On the other hand, selective withdrawal of police protection, as when the Southern states during the Reconstruction era refused to give police protection to their black citizens, is the prototypical denial of equal protection.

*Id.* at 1007.

Other examples of sound equal protection claims that exist even where there would be no underlying due process right come readily to mind. For example, although there is no constitutional requirement that a state provide a system of appellate review, if the state chooses to do so, it cannot discriminate against indigent defendants. *Griffin v. Illinois,* 351 U.S. 12, 18 (1956) (addressing transcripts for indigent defendants); see also *Douglas v. California,* 372 U.S. 353, 357-58 (1963) (holding that states must provide appellate counsel for indigent defendants). Examples of this principle in non-criminal cases are also easy to find. Even though a student has no due process right to be admitted to a state university, she is entitled to complain about state university admissions systems that allegedly discriminate on the basis of race. *Gratz v. Bollinger,* 539 U.S. 244 (2003); see also *Fisher v. University of Texas at Austin,* No. 11-345, *cert. granted,*

Feb. 21, 2012. And even though a citizen has no due process right to any particular kind of tax system, he is entitled to complain about discrimination in the administration of a tax system. See *Hillsborough v. Cromwell*, 326 U.S. 620, 623 (1946) ("The equal protection clause . . . protects the individual from state action which selects him out for discriminatory treatment by subjecting him to taxes not imposed on others of the same class."); see also *Armour v. Indianapolis*, No. 11-161, argued Feb. 29, 2012 (presenting the question whether the Equal Protection Clause precludes a local taxing authority from refusing to refund payments made by those who have paid their assessments in full, while forgiving the obligations of identically situated taxpayers who choose to pay over a multi-year installment plan).

Importantly, the equal protection claim that Del Marcelle is trying to raise is different from a claim that takes issue with an arrest or a citation. If all that Del Marcelle were arguing was that police should not have cited him because he had done nothing wrong (and in fact, it was the bikers who were the real offenders), that would be akin to challenging the citations themselves, or perhaps it would provide support for a state-law claim of selective prosecution. The citations themselves, however, are not necessary to Del Marcelle's equal protection claim. The point is that the police are treating *him* differently, in a way that injures him. Whether that differential treatment takes the form of baseless citations, or malicious arrests, or any other adverse action, makes no difference.

The question before the court is thus whether Del Marcelle's complaint (or a possible amended complaint) might be read to state a class-of-one claim under the Equal Protection Clause. It is useful to begin by locating class-of-one cases within the broader context of equal protection jurisprudence. From there, we take a closer look at the substantive requirements for these cases, and finally we consider what is required to plead such a case.

B

The familiar language of the Equal Protection Clause is as good a starting point as any. It says "nor [shall any State] deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. AMEND. XIV, § 1. The Supreme Court has repeatedly confirmed that the Clause "protect[s] persons, not groups." *Engquist,* 553 U.S. at 597 (quoting *Adarand Constructors, Inc. v. Peña,* 515 U.S. 200, 227 (1995)); see also *Shelley v. Kraemer,* 334 U.S. 1, 22 (1948). Although the concept of the Clause requires comparison between the injured party and others, the Court has also said that "the number of individuals in a class is immaterial for equal protection analysis." *Olech,* 528 U.S. at 562 n.*. As the Court succinctly put it in *City of Cleburne v. Cleburne Living Center, Inc.*, the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." 473 U.S. 432, 439 (1985). Straightforward as this may sound, however, experience shows that a great deal lurks below the surface. The questions of who bears the burden of demonstrating that a person is not receiving

the "equal protection of the laws" to which the Constitution entitles her, and what it takes to meet that burden, are more complex.

The *Cleburne* Court summarized the answers to these questions in a way that is helpful:

> The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest. When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes.
>
> The general rule gives way, however, when a statute classifies by race, alienage, or national origin.

473 U.S. at 440 (internal citations omitted). Although this passage speaks of legislation, *Engquist* confirmed that the Clause's protections "apply to administrative as well as legislative acts." 553 U.S. at 597.

A moment's thought shows that a true class-of-one case (that is, one that does not implicate fundamental rights) falls under the "general rule" that the Court has articulated—in other words, the allegedly unequal treatment of the "one" must be upheld as long as it is rationally related to a legitimate state interest. As the Supreme Court has said, "[u]nless a classification trammels fundamental personal rights or is drawn

upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest." *City of New Orleans v. Dukes,* 427 U.S. 297, 303 (1976). If a classification is based on a forbidden characteristic, then by definition it would not be a class-of-one case. Under rational-basis review, the Court continued, "it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment." *Id.* at 303-04. It is the plaintiff who bears the heavy burden of showing such a complete lack of rationality in the challenged state action.

The Supreme Court's two recent class-of-one cases confirm in our view that this is the standard faced by the Del Marcelles of the world. In *Olech,* the Court recalled that it had "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." 528 U.S. at 564. The Court specifically declined to reach the question whether subjective ill will is also required in these cases. *Id.* at 565. *Engquist* reaffirmed *Olech,* quoting with approval the language to which we have just referred. 553 U.S. at 601. Stressing the importance of the capacity in which a state acts, however, *Engquist* held that when the state acts as an employer, the class-of-one theory is unavailable. In so holding, it relied on a long line of cases that have recognized in other constitutional

areas the unique position of the government-as-employer. See, *e.g., O'Connor v. Ortega,* 480 U.S. 709 (1987) (Fourth Amendment); *Bishop v. Wood,* 426 U.S. 341 (1976) (Due Process); *Connick v. Myers,* 461 U.S. 138 (1983) (First Amendment).

At the same time, the Court offered some observations about "forms of state action . . . which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments." 553 U.S. at 603. In such cases, it noted, the rule that people should be treated alike, under like circumstances and conditions, is not violated merely because one person is treated differently from others, because the difference in treatment is an accepted consequence of the discretion granted. *Id.* It gave as examples of the latter situation the traffic officer posted on a busy highway who randomly chooses from all who are speeding just a few who receive a ticket. This does not represent impermissible discrimination, the Court opined, with the following comment:

> But assuming that it is in the nature of the particular government activity that not all speeders can be stopped and ticketed, complaining that one has been singled out for no reason does not invoke the fear of improper government classification. Such a complaint, rather, challenges the legitimacy of the underlying action itself—the decision to ticket speeders under such circumstances. Of course, an allegation that speeding tickets are given out on the basis of race or

sex would state an equal protection claim, be-
cause such discriminatory classifications im-
plicate basic equal protection concerns. But al-
lowing an equal protection claim on the ground
that a ticket was given to one person and not
others, even if for no discernible or articulable
reason, would be incompatible with the discre-
tion inherent in the challenged action. It is no
proper challenge to what in its nature is a sub-
jective, individualized decision that it was sub-
jective and individualized.

*Id.* at 604. The Court then applied that principle to the
employment context, noting that employment decisions
are often subjective and individualized. *Id.* The Court
explicitly noted, nevertheless, that it was not categorically
ruling out class-of-one cases for anything but those in-
volving public employment. *Id.* at 607 ("[T]he class-of-
one theory of equal protection has no application in
the public employment context—and that is all we
decide . . . .").

This case presents the question how *Olech* and *Engquist*
apply at a more general level. In particular, the issue
is whether it is enough for a class-of-one plaintiff to
plead and ultimately to prove irrationality in the state's
action, or if in addition the plaintiff must demonstrate
illegitimate animus. One group of cases has required
the latter showing. See, *e.g., Hilton v. City of Wheeling*,
209 F.3d 1005, 1008 (7th Cir. 2000); *Purze v. Vill. of
Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002); *Cruz v.
Town of Cicero*, 275 F.3d 579, 587 (7th Cir. 2001). Another

group has phrased the test in the alternative, looking to see if there was no rational basis for the difference in treatment *or* the cause of the differential is "totally illegitimate animus." *Lunini v. Grayeb*, 395 F.3d 761, 768 (7th Cir. 2005); see also *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004). Panels of the court have noted the confusion in our case law on more than one occasion. See, *e.g.*, *Srail v. Vill. of Lisle*, 588 F.3d 940, 944 (7th Cir. 2009); *Racine Charter One, Inc. v. Racine Unified Sch. Dist.*, 424 F.3d 677, 683-84 (7th Cir. 2005). Other courts of appeals have also stated the test in divergent ways. See, *e.g.*, *Analytical Diagnostic Labs v. Kusel*, 626 F.3d 135, 140 (2d Cir. 2010) (not imposing an animus requirement but requiring plaintiffs to show that "decisionmakers were aware that there were other similarly-situated individuals who were treated differently"); *Lindquist v. City of Pasadena*, 525 F.3d 383, 387 (5th Cir. 2008) (explicitly declining to impose an animus requirement). We had hoped to make some sense of all of this, but regrettably, that proved to be impossible. At most, perhaps, the differences among us narrowed slightly as a result of this litigation, but ultimate resolution will have to await another day.

C

As the Tenth Circuit has observed, it is necessary to pay attention to both the substantive standards and the pleading standards that govern these claims. See *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210 (10th Cir. 2011). Del Marcelle faces the challenge of presenting a case that

is governed by the equal protection theory that gives the greatest deference to the state actor. He does not assert that he belongs to any class that receives special solicitude from the courts, nor is he saying that the actions of the Brown County Sheriff or the various municipal police officers infringed any fundamental right that the Supreme Court has recognized. The state actions in question are therefore entitled to a presumption of constitutionality; they can be disturbed only if they are in fact discriminatory, and if that discrimination lacks any conceivable rational basis; it is the plaintiff's burden to show why that might plausibly be the case. We use the word "plausibly" here for a reason. That is the standard that the Supreme Court has adopted for judging the adequacy of pleadings.

As we explain below, in our view a plaintiff seeking to present a class-of-one case must include in his or her complaint plausible allegations about the following elements: (1) plaintiff was the victim of intentional discrimination, (2) at the hands of a state actor, (3) the state actor lacked a rational basis for so singling out the plaintiff, and (4) the plaintiff has been injured by the intentionally discriminatory treatment. In so doing, the plaintiff must present facts—not bare legal conclusions—that support these points. *Twombly*, 550 U.S. at 544; *Iqbal*, 556 U.S. at 662; *Swanson v. Citibank*, 614 F.3d 400 (7th Cir. 2010). In particular, the complaint must set forth a plausible account of intentional discrimination, which is required for any violation of the Equal Protection Clause. See, *e.g.*, *Washington v. Davis*, 426 U.S. 229 (1976); *Wayte v. United States*, 470 U.S. 598, 610 (1985)

("[D]iscriminatory purpose" can be shown by demon-
strating that "the decisionmaker . . . selected or reaffirmed
a particular course of action at least in part because of,
not merely in spite of, its adverse effects . . . .") (quotation
omitted). This is no small task. The complaint must
also indicate how the plaintiff proposes to shoulder the
burden of demonstrating the lack of a rational basis.
There is no single way to accomplish that task, but, as
*Engquist* stresses, a plaintiff must do more than show
that state actors who have legitimately been delegated
discretion to act simply exercised that discretion. It is
entirely rational, in other words, to permit state actors
to make individualized decisions when the very nature
of their job is to take a wide variety of considerations
into account.

The other factors that have crept their way into our class-
of-one cases—personal animus, illegitimate motives,
inexplicable deviations from clear rules—are not primary
rules. They are instead illustrative of the kind of facts
on which a plaintiff might rely in a complaint to show
that the lack of a rational basis is not merely possible,
but plausible. In some instances, well illustrated by
*Olech,* the state actor may inexplicably have failed to
follow what the *Engquist* Court called a "clear standard
against which departures, even for a single plaintiff,
could be readily assessed." 553 U.S. at 602. Plaintiff
need only plead the existence of such a standard and
the state actor's failure to meet that standard in order
to satisfy *Twombly* and *Iqbal* and go forward. In many
other cases, however, more will be required to cross the
line between possibility and plausibility of intentional,

irrational behavior. Often something like animus, or the lack of justification based on public duties for singling out the plaintiff (as Judge Posner proposes), or an impermissible personal motivation, will serve that purpose. Again, as the Supreme Court indicated in *Engquist*, it will not be enough to challenge "what in its nature is a subjective, individualized decision" solely with the accusation "that it was subjective and individualized." *Id.* at 604. That sort of accusation would not be enough to show plausibly that plaintiff will be able to rebut the presumption of rationality.

The Tenth Circuit took much the same approach as the one we are describing in its *Kansas Penn* decision. It held that a class-of-one plaintiff bears a "substantial burden" to describe those who are similarly situated in all material respects (*i.e.*, others who have been treated more favorably), how plaintiff was treated differently, and that there is "no objectively reasonable basis for the defendant's action." 656 F.3d at 1217. That court, however, thought that it was necessary at the pleading stage to provide evidence of the comparators, rather than saving that detail for summary judgment. This represented an extension of the holdings in the cases on which it relied, all of which involved the affirmance of summary judgment for the defendants. See 656 F.3d at 1217-18, citing *Jicarilla Apache Nation v. Rio Arriba C'nty*, 440 F.3d 1202, 1212 (10th Cir. 2006); *Jennings v. City of Stillwater*, 383 F.3d 1199, 1214 (10th Cir. 2004); *Analytical Diagnostic Labs*, 626 F.3d at 143; *Cordi-Allen v. Conlon*, 494 F.3d 245, 251 (1st Cir. 2007); and *Purze*,

286 F.3d at 455; see also *McDonald*, 371 F.3d at 1009 (affirming summary judgment based on failure to prove comparators).

In *Geinosky v. Chicago,* 675 F.3d 743 (7th Cir. 2012), this court held that there was "no basis for requiring the plaintiff to identify [the similarly situated] person *in the complaint*." *Id.* at 748 n.3 (emphasis in original). That was because Geinosky alleged that police had given him numerous baseless parking tickets over a long period of time; to require Geinosky to name a specific comparator in his complaint would have asked him to do nothing more than point to another random person in Chicago, who had not received the same pattern of parking tickets. The allegation of discrimination under these circumstances was enough in itself to signal that others were not being subject to the same kind of harassment. It was thus not essential that Geinosky identify a specific comparator in order to paint a plausible picture of intentional discrimination without a rational basis—there was no conclusion that could be drawn, other than the police had targeted Geinsoky alone to receive a series of baseless tickets.

Not all cases will be this straightforward. In some, as part of the burden of pleading intentional discrimination, plaintiff may need to be more explicit about how his or her treatment was different from that of others. This flows from the substantive test for an equal protection claim: discrimination for this purpose occurs when one is "intentionally treated differently from others similarly situated." *Olech*, 528 U.S. at 564; see also *City*

*of Cleburne,* 473 U.S. at 439. It may be difficult to accomplish this task without including some facts in the complaint that tell the court who (if it is not obvious, as it was in *Geinosky*) falls in the favored class-of-many. These kinds of details could, as a practical matter, be essential to signal how the plaintiff proposes to rebut the presumption that an officer with discretion to consider a variety of factors has done nothing more than exercise that discretion. Plaintiff must plead facts showing that his unfavorable treatment could not have rested on a legitimate exercise of discretion conferred by the relevant laws. The more discretion an official has, the more difficult this task will be. But as *Geinosky* demonstrates, in some cases the discriminatory nature of the official conduct will be apparent even without any particularized allegations about the favored group, and so we would not impose an across-the-board requirement that plaintiffs identify a specific comparator in the complaint. To the extent that this deviates from the *Kansas Penn* holding (and the difference may be only superficial, since the facts before that court were different from those in *Geinosky*), we would part company with the Tenth Circuit. We believe that it is enough, as we have already said, to plead the four elements set forth earlier: intentional discrimination, on the part of a state actor, lack of a rational basis, and injury.

This approach "addresses the main concern with the class-of-one theory—that it will create a flood of claims in that area of government action where discretion is high and variation is common." *Kansas Penn*, 656 F.3d at

1218. Given the presumption of validity that attaches to both state legislation and administrative or executive activity, a plaintiff will often need to set out relatively detailed allegations to exclude the possibility that a defendant acceptably exercised discretion. This task will be easier, as *Engquist* pointed out, when the state has inexplicably deviated from a clear rule like the easement length in *Olech*; it will be more difficult for cases attempting to attack decisions where discretion plays a significant role. As the Supreme Court warned in *Twombly* and reiterated in *Iqbal*, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." 556 U.S. at __, 129 S. Ct. at 1949. Qualified immunity will also frequently relieve state actors of the burden of litigation in this area: if discretion is broad and the rules are vague, it will be difficult to show both a violation of a constitutional right and the clearly established nature of that right. See, *e.g., Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

This illustrates how one would distinguish the case of the police officer who cannot stop all speeding cars and thus randomly selects just a few from a proper class-of-one case. At first blush, it might appear that the officer has behaved in an arbitrary fashion, but that impression is easily dispelled: a *system* of random checks is a rational enforcement mechanism. Police act with limited resources and cannot possibly stop every single speeder. Furthermore, it would be almost impossible to demon-

strate intent to discriminate against the particular stranger whom the police officer happened to pull over. As *Kansas Penn* noted, "the fact that government action is infrequent, or that a formerly unenforced regulation is enforced, is not enough to create a federal cause of action." 656 F.3d at 1220; see also *Chavez v. Illinois State Police,* 251 F.3d 612 (7th Cir. 2001) (finding that plaintiffs failed to prove intentional race discrimination in highway stops made by Illinois State Police, and thus failed to state an equal protection claim). Only if the complaint offers facts that would support the elements outlined above should it be able to survive a motion to dismiss under Rule 12(b)(6).

D

Last, we explain why we would refuse the invitation from the appellees to extend *Engquist*'s holding to all forms of law enforcement. This court has, it is true, held that no class-of-one claim is possible for a person who wants to complain, essentially, about prosecutorial discretion. *United States v. Moore,* 543 F.3d 891 (7th Cir. 2008). In *Moore,* the defendant argued that the Equal Protection Clause is violated by the law that allows a criminal sentence below the statutory mandatory minimum only upon a government motion based on substantial assistance. That opinion first noted that Moore was not similarly situated to others who had been prosecuted in state court for offenses involving approximately the same drug amounts. More important, however, was the fact that Moore's argument was flatly

inconsistent with the theory of nearly complete pros-ecutorial discretion that prevails in our system. (We say "nearly" because that discretion, as was noted in *Moore*, is subject to constitutional constraints such as the pro-hibition against discrimination on the basis of race or religion. But that qualification played no part in either Moore's case, nor is it relevant here.) Critically for present purposes, even irrationality is not a ground on which prosecutorial discretion may be challenged. *Id.* at 900. With irrationality off the table, it follows that the third element of a class-of-one equal protection claim can never be satisfied when the attempted attack is on an exercise of prosecutorial discretion. *E.g., United States v. Green*, 654 F.3d 637 (6th Cir. 2011) (rejecting equal protection challenge to prosecution's decision to proceed in civilian rather than military court). We thus have no problem adhering to the holding in *Moore* to the effect that there is no place for a class-of-one theory directed against prosecutorial decisionmaking.

The situation presented in cases challenging police action is quite different, as this court explained in *Hanes v. Zurick,* 578 F.3d 491 (7th Cir. 2009):

> Although the police enjoy broad freedom of action, their discretion is much narrower than the discretion given to public employers. First, in contrast to an employer, who is entitled to make decisions based on factors that may be difficult to articulate and quantify, an officer must justify her decision to stop a suspect by pointing to "articulable facts." And while employment deci-

sions are inherently subjective, subjective inten-
tions play no role in evaluating police seizures
under the Fourth Amendment. . . . [A]sking a court
to determine whether a police officer's act was
constitutional is not at all unprecedented.

*Id.* at 495 (internal citations and quotation marks omit-
ted). The plaintiff in *Hanes* had alleged that the police
were motivated by malice and had no reason related
to their official duties for their actions. Had this been
all, the complaint likely would have been dismissed
under *Iqbal* for containing nothing but a conclusion of
law. The complaint, however, included details that
showed that this was not merely possible but was
actually plausible. The police had arrested Hanes eight
times; those arrests had led to 13 criminal charges for
minor crimes; yet every charge was later dropped. At
the same time, the police were ignoring Hanes's own
complaints against others, no matter what the under-
lying facts.

   Defendants point to a recent decision of the Eighth
Circuit, *Novotny v. Tripp County*, 664 F.3d 1173 (8th Cir.
2011), which they say has extended *Engquist* to discre-
tionary law-enforcement decisions like those at issue
here. We do not read *Novotny* so broadly. Among other
complaints, Novotny charged that county officials were
unequally enforcing the county's weed ordinances
against him. But his only evidence for this was hearsay
in two letters from the state Department of Agriculture
to the county weed board—evidence that was insuf-
ficient to support summary judgment. Only after

making that point did the Eighth Circuit add that
Novotny had failed to state a class-of-one claim, because
the weed ordinance was a uniform rule with neces-
sarily discretionary enforcement. 664 F.3d at 1179. In the
absence of any reason to think that the Department
of Agriculture and the weed board were discriminating
against Novotny in an entirely irrational way—
and Novotny provided none—this ruling is entirely
consistent with the rule we are proposing. Although
the Eighth Circuit, in passing, cited *Engquist* for the
proposition that the class-of-one principle does not
apply to discretionary decisions based on a broad array
of subjective, individualized criteria, see *id.,* this point
was neither explored fully nor was it necessary to the
outcome. We therefore consider *Novotny* to be distin-
guishable from the case before us.

Because police action of the type alleged in *Hanes* and
in Del Marcelle's case falls closer to the "discretionary"
end of the spectrum, a putative class-of-one complainant
faces a much higher burden to show that the exercise
of that discretion was irrational. This, we believe, is
what our court and others have been driving at ever
since *Olech* and *Engquist* in the suggestions that animus,
or malice, or lack of any possible legitimate state
purpose, plays a part in class-of-one cases. Those motive
elements are not always necessary, as *Olech* illustrates,
and indeed, it is not clear to us that Judge Posner's sepa-
rate opinion even takes that position. Nor should
animus (or something similar) be seen as an alternative
to a showing of irrationality. Instead, in the cases that
do not rest on the state's failure to follow a clear

standard, the plaintiff has the burden of showing in the complaint some plausible reason to think that intentional and irrational discrimination has occurred. Pleading animus or improper purpose will often be an effective way to accomplish that goal.

*    *    *

Fanciful stories of persecution, backed up by nothing but conclusory allegations, will not pass the bar established by Rule 12(b)(6). But there will be occasional cases that do, as the Supreme Court has taught. We return to the most basic proposition: the Equal Protection Clause protects individual persons, not groups. If a plaintiff can meet the pleading burdens we have described here, then he or she should be entitled to pursue a class-of-one case.

This brings us to the driving force that has split our court evenly down the middle. Five members would end Del Marcelle's case here; five would allow him to replead. Unfortunately, this even division has prevented us from coming to rest on the substantive standard that should govern these cases. These standards were unclear, to put it charitably, at the time Del Marcelle filed his *pro se* complaint, and at the time the district court evaluated it. The full court agrees that as it stands, Del Marcelle's complaint is inadequate. As we would put it, the complaint fails to meet his substantial burden to present a plausible account that the police acted without any rational basis when they failed to respond to some of his complaints but did respond to the gang members' corresponding complaints by issuing

citations to him. For example, Del Marcelle attached a police report to his complaint showing that police investigated an incident in which Del Marcelle asserted that a gang member tried to run him over. But Del Marcelle's own filing shows that the police did not ignore his complaint. To the contrary, they spoke to the car driver and various witnesses (except for Del Marcelle, who refused to speak to them). They concluded that Del Marcelle had actually provoked the incident by throwing a rock at the car and shattering its windshield. Del Marcelle provides no reason for the court to believe that this police report was falsified or to question its conclusions. Thus, at present (even as supplemented by the additional materials we mentioned at the outset) Del Marcelle's complaint does not plausibly suggest that police officers failed to respond to him because they irrationally discriminated against him. Instead, it appears to be just as likely that police acted rationally by declining to take action on what they determined to be baseless complaints.

The question is what to do now: simply affirm the dismissal, or permit Del Marcelle to replead consistently with an agreed standard. In light of the unsettled state of the law, the general rule favoring an opportunity to replead, and the fact that Del Marcelle was proceeding *pro se*, we would give him one more chance. The court may think that it can predict what he will be able to do, but it is critical to recall that the factual record has not yet been developed, and so we are all operating in the dark. We are not prepared to express any opinion on the question whether an amended complaint could

pass muster. Had the court been willing to give Del Marcelle another chance, it is also worth noting that this would have been more limited than his original suit. Specifically, we would have held that he cannot proceed against the two individual defendants, County Executive Tom Hintz and Ashwaubenon Village President Mike Aubinger, without a showing that each one was personally involved with the course of action he is challenging. Similarly, any complaint against Brown County or Ashwaubenon would have needed to satisfy the criteria of *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978). The district court's earlier order had nothing to say about either individual liability or municipal liability.

We end with a brief comment on the standard of liability that four members of the court have endorsed. In our view, it will be a difficult one for the district courts to follow. It is all too easy for a plaintiff to accuse someone of a malicious motive and thus to impose on the entire system the burden of going forward. The standard we favor, the one in this opinion, would be easier for the district courts to apply at the pleading stage because it does not require mind-reading. Finally, we are deeply concerned that Judge Posner's opinion might be read as endorsing a new type of rational-basis test that the Supreme Court has never created—some kind of "rational-basis minus" level of review. We hope that this is not the case, but it seems that he is concerned that too many class-of-one cases will slip by the normal rational-basis screen.

We do not share that view, but unfortunately we have not been able resolve the matter in the present case.

We would reverse the judgment of the district court and remand to give Del Marcelle a chance to replead, using the standards we have described in this opinion. We therefore dissent from the order of the court affirming the judgment of the district court.